The first case, docket 2006-1633, San Juan County v. International Trade Commissioners. The fundamental issue in this case is a question of claim construction and whether or not the International Trade Commission committed a fundamental error. When it decided sui sponte to adopt as the appropriate definition of the term controlled amount of protic material, the conversion of nitrobenzene. This is a term that does not appear in the specification. It is a term derived from a particular experiment as a single example in this particular application. When you say sui sponte, Mr. Phillips, you mean an interpretation that neither side put forward? Not only neither side put forward, but it's even beyond that. I mean, no side's put forward, neither the staff of the ITC, neither FLEXUS, nor obviously Synorgchem, or any of the other respondents. Why is it so unusual for a judge to observe that each position may be a bit strange and to select something that's intermediate? Well, let me just add one additional point to that, which is that the ALJ also did not adopt this particular construction. What makes it unusual is that you sit here with essentially five equally valid and completely undifferentiated means of defining this particular term. And it is not within the ambit of the ITC arbitrarily to select one over another without any basis in the record that remotely supports it. And remember, because this was not a theory put forward by any of the parties, there is no testimony. There is nothing in the record with respect to the conversion of nitrobenzene. And indeed, if you think about it, Judge Newman, it's about the least likely matter of concern to these parties, because you get nothing out of the conversion of nitrobenzene. It is something that's largely driven by how much base or how much nitrobenzene you happen to be putting in. And the issue is not, at the end of this, how much nitrobenzene do you have? The issue is, how much of the derivatives of 4-ADPA do you have? So you might use yield, or you might use selectivity, because it's obviously a very important part of this. Is it your position that the definition that the ITC derived does not in any way satisfy any of the requirements of that? Is it an impossible definition, an unusable definition? It is insolubly ambiguous, is what it is, because, again, there is no external basis. There's nothing either intrinsic or extrinsic that would cause you to choose the conversion of nitrobenzene, as opposed to selectivity, or yield, or what I think is actually the more obvious one, which is the actual percentage by volume of the protein material, if the protein material happens to be water, or 8% by volume if it happens to be methanol. Those are all much clearer and, candidly, much more consistent with the overall tenor of this particular patent application. And the Commission rejects all of those without any explanation, adopts this one from a particular example, and even that is completely unsupportable, because if you do exactly the same test, deriving a different example, you would end up with a nitrobenzene conversion that is fundamentally different than the 12% to 63% that the Commission snatched out of the air as the guiding post by which to measure this particular invention. Well, what is our, your argument is that the specification defines the term, and that's what you're arguing on, and the Commission said that that definition was not consistent with example 10, is that correct? Yes. Yeah. So, what is the role of the examples in the specification? I've never been 100% clear about that. Is it accepted that the examples are preferred embodiments of the invention? It would be, I think it is accepted that they are a preferred embodiment, but they obviously cannot modify the expressed language of the specification if it provides, in fact, an explicit definition. And here, the Commission quite properly found that, in Joint Appendix 265, column 4, that that language is a specific definition to control the amount of quotation marks. It's an amount up to which it inhibits the reaction of anion with nitrobenzene up to about 4% H2O based on the volume. But the example is as much part of the specification as anything else. In fact, as a specific statement of exactly what happened scientifically, I would think that it is something that is there to be viewed and relied upon. As I recall, the example showed the scope of an invention, and may or may not be the one to be exactly equated, and I think is contrary to the general approach of inventors to show that an invention has a certain scope. Well, Judge Whitman, I'm not taking the more aggressive position here, which is that you ought not to look at the examples. What I'm suggesting to you, and what we argued in our brief, is that example 3 is clearly the one that is designed to deal precisely with the question, what do you do when water is the proteic material, and anion and benzene are used as the reactants? And it tells you exactly what comes out of that process, whereas example 8 doesn't remotely tell you anything about the water. You can in fact do the experiment, but the fact is the inventors never conducted that experiment. They never looked at what water came out of that particular experiment. So while that example may inform someone skilled in the art on some other facet of this particular reaction, it clearly was never intended to inform anybody, particularly if you provide public notice, that that would be the sine qua non of this particular invention. It makes much more sense to look at example 3, which reinforces the specific statement in the specification that 4% is the number you ought to be looking at. And given that signer can clearly use this amount well beyond 4%, there is no infringement in this particular case. So what we have in your view is a specification which is inconsistent. There are two inconsistent examples in the example, I forget whether it's 8 or 10 examples that the commission relied on. It is just a mistake then. Yes. If it's designed as a preferred embodiment. Right. If it was designed as a preferred embodiment, it was a mistake, and this court has held them to their own. That sometimes a preferred embodiment gets rejected because the way the claim was defined was defined in a way. And this should come as a huge surprise in this context, because no one ever measured water prior to putting in this invention, so it never struck them. They believe, as this application states as plain as day, that the inhibiting factor comes at 4%, which is why anyone reading it, which is why the testimony says quite plainly, when signer came at it, they looked and then they evaluated their process, and when their process ended up with water nowhere near 4%, they believed, quite reasonably, that they didn't engage in any infringement in the context of this particular case. So it seems to me the right answer in this case is 4%. That's the most reasonable way of interpreting this, given the important notice function. At a minimum, it cannot be that the conversion of nitrobenzene is the appropriate approach. It may be that there's some other approach, but candidly, I think if you get past the 4% number, what you have to go to is that it's just hopelessly indefinite, because there isn't any combination of those, or just water by water or protein material by volume. There's just no mechanism. There's nothing in here that remotely tells you which one of those to select. And at a minimum, it seems to me that the Commission's choice to just grab one arbitrarily has to be rejected. The alternative... What's the impact of the plain construction on the obviousness analysis? I was just going to turn to the obviousness analysis. Well, the problem with the obviousness analysis... Well, there are two problems with the obviousness analysis. If we adopt... If we were to agree with your claim construction, would there still be an obviousness problem here? Well, I mean, yes. I think there would be an obviousness problem. I don't think the court would have to resolve the obviousness problem if it agreed with our construction of the claims, because there's no infringement. I don't know that the court needs to take on a non-jurisdictional issue. And there'd be a little burden around. A lot of cases wouldn't apply to the IPC because the decision on obviousness would have a five-hour stop. Right. I think that would be the basic argument. Although, obviously, the court felt obliged to decide the obviousness issue. Again, I think what you'd have to do is at a minimum vacate what the ITC did here, because its position on obvious to try could not be any more inconsistent with the Supreme Court's intervening decision in KSR. And therefore, at a minimum, you'd vacate and remand on that basis. But again, even before KSR, the commission didn't make any of the kinds of findings you would expect under Graham before you could make a determination of obviousness. And candidly, obviousness is going to change dramatically once you get out of worrying about issues like selectivity and yield and look exclusively at conversion of nitrobenzene. Because the truth is, nobody ever thought conversion of nitrobenzene was relevant to anything until after the commission acted. And at a minimum, we ought to be able to get an additional opportunity to go back to the commission and demonstrate that that conversion is relevant. But we know a patentee doesn't have to understand the details of the mechanism as to how or why certain things work. And so what more do you think should have been here? All of the things that you mentioned? No, I don't think you need all of the things that I mentioned, candidly. I think you just need one of the things that I mentioned. I think you have to identify what is the metric that drives the analysis. I mean, that's what really distinguishes this case from a case like Exxon. Exxon, there was a 30% number that ultimately drove the analysis of how to interpret the specification. Here, we don't have any mechanism for determining what it means to inhibit the reaction. Inhibit the reaction for what outcome? And that's what they needed to do. They needed to say yield or selectivity or something. If it works? I'm sorry? If it works to perform a function and it tells you how to figure out when you reach that point. That's why I was asking what more is needed. The more, well, because to say that it works, I mean, the invention here is not just the reaction itself. The invention here, obviously, according to the other side, is controlling the amount of product material. And the question is, what does that mean? To say it works doesn't remotely tell you anything. Because again, you have to know to what end. What is it you're trying to accomplish? And indeed, give the FLEXUS experts credit for their testimony.  How do you know it works? You know it works when you get whatever you wanted on that particular day from that particular experiment. Well, that's great, except that provides not one jot or tittle of notice to the world as to what it is that they are supposed to do. And that's the flaw of judgment. And they needed to identify at least some outcome with sufficient specificity that you could then apply an axon test. When you don't allow any way to select from among four or five different outcomes as the mechanism for this definition, then the answer is that it's insolubly ambiguous. And if that circumstance happens, as it does here, then ITC's decision must be set aside. I think it ought to be dismissed. At a minimum, it's got to be vacated and remanded for any of the three reasons that I've identified. I just want to bring you back to obviousness for a moment. Because I'm puzzled as to how you can have an adherency in an obviousness analysis. You're assuming that the motivation test in some form survives KSR. It seems to me you've got to know what you have there in order to have the motivation. I don't see how the motivation is combined when the property is simply inherent in the motivation. Well, that may be true. I don't think that's the facts of this particular case, Judge Stark. We're dealing with a situation where the problem you solved was to take some variant of the chloro-nitrobenzene and mix it with anion. And the problem was that you didn't want the chlorine. You wanted that chlorine out. It doesn't seem to me it's a huge leap to say to yourself, I want to then take the chlorine out, the chloro part out, and do nitrobenzene and mix it with anion and see what we get. That's precisely what he did. And we're thinking that took him to Wahl. And Wahl, in fact, will have that mixture. And that mixture will, in fact, create derivatives of A and B. And therefore, at that point, it seems to me it is obvious. And it was an obvious try. But Wahl was 100 years ago. And that seems to be a very interesting reliance, if there's been nothing since Wahl. Well, there are sort of two answers to that, Judge. One is, I don't think it makes any difference how old it is if the inventor concedes that he immediately went to Wahl as part of this process. So that by itself suggests that Wahl would have, you know, if you were looking at it, if you were experimenting in this area, you end up with Wahl in any event. But second of all, there would be no particular reason to go through an analysis of Wahl in the intervening years because you have this particular reaction with the chloro-nitrobenzene that was perfectly fine. Nobody cares about the environmental consequences. That's sort of unfortunate, to be sure. But it's only when you knock out the chloro part of it, and you're looking at nitrobenzene and aniline, and then you say, well, what will happen in that context? And as soon as they did that, within almost days of deciding to go down that path, this inventor said, take out the chloro, see what you get. Now, admittedly, there's a lot of smoke and mirrors the other side puts up about other efforts that were going on. But if you just look at what this inventor did, he did what, to my mind, and again, I'm nowhere near an organic chemist, but to my mind, it seems like a pretty logical decision. Take out the chloro. But that's the problem. It's not your mind. I mean, what the prior art discloses is a question of facts. We have conflicting expert testimony as to what Wahl discloses here. Well, we do have some conflicting testimony about what Wahl discloses, but on the core, there's no conflict on sort of the core idea because, again, the problem is you don't really have an obviousness analysis that's predicated on the plane construction that the commission adopted so responsibly. So there isn't really a very thorough evaluation of the conversion to benzene, of nitrobenzene. At a minimum, we ought to be entitled to go back to the commission to have an opportunity to put on evidence with respect to that if we were going to end up in a world of dealing with obviousness.  There's no evidence on that. We must move on. We will have a couple of minutes for you both to pick up your time and questions. Good morning, and may it please the Court. In terms of notice and opportunity for comment, the commission published in the Federal Register on April 19, 2006, a notice stating that it was considering changing the claim construction and gave the parties, all the parties, an opportunity to comment specifically on a claim construction which might remove the EG 4% language from the claim construction. But the real question is notice to the public. What's the matter with looking at the specifications and seeing the specific definition of controlled amount and concluding that that covers over an example which doesn't even refer to the amount of water specifically, but that's just calculated from the parameters in the example. Why shouldn't the explicit definition of controlled amount? Well, we have several responses. The commission believes that the claim construction does not include the EG clause, that that is given as an example. But that doesn't make particular sense to me because it's within the definition. What, you know, says controlled amount? I mean, we have all of these cases where we're saying, gee, life would be a lot easier for us if you defined things explicitly in the specification. This seems to be an example in which it's defined explicitly. Indeed, the commission agreed that it was defined explicitly. So how can you read out part of the definition which talks about the 4% water in the analog situation? We're not trying to read out example 3. The experts agreed that 4% came from example 3. And the sentences in that paragraph, which I believe we're looking at, immediately preceding and following that 4% state that this is an example and that when the reaction conditions vary, then the amount of water will vary with the reaction conditions. Counsel, I'm ready to break a little bit, maybe, in regards to what you're really proposing here with regards to the EG clause. Is it your position that an example given within a definition should never be considered as part of the definition? I'm wary to say never, never say never. Close to never? I would say close to never under our theory of the case, especially given this clause here in that paragraph explaining that the reaction conditions may vary and explaining to an organic chemist that when those reaction conditions vary, the amount of water will also vary. And then there are over 10 examples in this specification which show that when the temperature or the aerobicity, the amount of oxygen, the amount of base, the amount of water, that when all these things change, the reaction conditions will change and the amount of water required will change. And so this patentee should actually be rewarded for coming forward with showing the public that when the reaction conditions change, the amount of water will change. Well, suppose that sentence were taken out of the specification, a sentence you're relying on that says that the amount of water can vary with the conditions. Suppose all we get was a sentence defining controlled amount with the example of 4% water in the anti-carbon context. Would that tell us that you had to have less than 4% water or that 4% water was the upper limit in that context? I'm going to say no for a different reason. And that's this other reason, which is that under In Re Swineheart, these are 112.6 claims. So that's the 1971 decision by this court's predecessor court which explains that functional adjectives like the word transparent when it's found in a claim is a functional claim under 112.6. And under 112.6, we have to look at the structure recited in the specification to give meaning to the function in the claim. An example of the basis for the commission's decision. The commission didn't discuss this except to say that to give a functional definition for a controlled amount. The commission said that a controlled amount is an amount up to that which inhibits. So this was really a functional definition that controlled is an amount up to that which inhibits. And then to the extent that we are elaborating on the commission opinion, I believe that that is within the bounds afforded by the law. Elaborate on it? It sounds to me as though you've discovered a new theory here which the commission didn't even mention. I mean, the commission didn't state the name Swineheart in its decision. That does not appear in a commission decision. So put that new argument aside. I mean, how can it be that an explicit definition with an example is not binding as a matter of claim construction? How can that be? Well, it really comes down to what is an express definition. And my answer to Judge Yackel was that the express definition, that the 4% is not a definition. It's merely an example which is not intended to be definitional in the way that a claim is definitional. It's in the definition, isn't it? It is in the definition according to Senator Kenton's claim construction. It was not in the commission's definition. How about the way the specification is written? It's in the definition, right? I understand, Your Honor, his concern. And it's an important concern that a public notice is important. And it's merely the commission's position that to a person of ordinary skill in the art, that that would not be definitional. Why not? Well, I guess we're continuing with a hypo that the for example language is not part of the definition, is it? So under that, the person of ordinary skill in the art would read the different examples in the specification. And even if this is not a 112-6 claim, this court explained in Phillips that it is permissible to look at a specification to give meaning to the definition. And this specification in its entirety includes example 10, for example, which uses 10% water when it's aerobic. For example, column 5, line 22 describes that everything preceding as described above refers to aerobic conditions. And so a person of ordinary skill in the art would say, OK, when you have anaerobic conditions like example 10, you're going to have a different set of examples. And I also believe that's so. You're saying that someone of ordinary skill in the art reading this would reject the explicit definition in favor of the computation made from the example, which doesn't even mention the amount of water. Because that would indicate to a person of ordinary skill in the art that the 4% is for aerobic conditions. And there's expert testimony that a person reading this, not seeing any qualifications, would actually read into that room temperature and pressure. Because a chemist, when a chemist doesn't see any qualifications, reads into that room temperature and pressure. And that is at J, 1369, 1375-76. And I would also just like to submit that there are times when an express definition would require you to look to the rest of the specification to give meaning to what is in the express definition. And I believe that this is one of those circumstances. I see my red light is on. Let me ask you a question. Mr. Phillips stressed that the commission came up with a claim of instruction that nobody had proposed. That is correct. And is that, in fact, can you elaborate on the origins of the final claim of instruction that we have? Well, we believe that under Lou Brizol, we are charged with coming up with the correct definition, even if that is not a definition espoused by one of the parties. And so we asked for notes and comments on the claim of instruction that were already out there. And the commission's question about whether that 4% language was, in fact, definitional. And based upon the responses from the parties, the commission decided that 4%, in the context of patent in its entirety, was not definitional. OK. Thank you, Mr. Ritter. Mr. Davis? May it please the court, Mark Davis for the intervening process. Let's talk about the claim of instruction and the issue, the statement of the specification, and whether it is a definition, whether it's not a definition. And then let's also clear up a little bit about Synerchem's assertion that there are these five different claim constructions floating about, and the commission picked one that had no basis from the prior. That's wrong. Senator Easton, there's not a definition in the specification that you're disagreeing with the commission on. OK. Let me address first the definition, and then I'll get to how many claim constructions there were asserted. Our position is that- Who hears how many claim constructions? That's absurd. Absolutely, you're right. So let's look at the specification, and let's look at what one of ordinary skill in the art would view the specification as stating. It's our position that one of ordinary skill in the art, reading the specification as a whole, as is the mandate from this court under Fizer and Phillips and other cases, they would view that statement in the paragraph appearing in column four as only the first part being a definition, and they would understand that the portion- What's the basis for that? I don't understand. Certainly not. We've got a specification here, an explicit definition. What's the basis for saying someone skilled in the art wouldn't follow that definition? Several points, Your Honor. And I think Your Honor is sort of starting with the assumption that it's a definition, and I don't think that the language in the specification supports that. If you look at what it says, it says a controlled amount of printed material on reading from column four, starting at line 48. And I think it would be good if everybody could get out that portion of the patent. This is JA-265 I'm looking at. It's in the back of the blue brief if you'd like to use that for convenience. Because I do think that this is important, and I think it's worth walking through the specification and seeing what the specification teaches as a whole. Because that's the test here, not what one part of one sentence fucked out of context might be twisted to mean. It's what the specification teaches as a whole. So it's twisted about it. I mean, if you take that one sentence, a controlled amount in quotes, which is usually a definition, right? And something's put in quotes. But you end, isn't that correct? The clause is a definition. Isn't it correct that when you put something in quotes in the specification, the plain term that's used in the claims, that that's used in the definition? It's correct that what follows in the same clause is part of the definition. But one, reading that for the plain meaning would view the definition as ending with what that clause is. The controlled amount is. But why is that true? What's the basis for that? Let me point to other. You have the plain meaning of e.g., which is for example. You also have the other teachings in the specification. For example, you have the teaching up at lines 32 that it's generally an amount about 4% water, which inhibits the reaction. And also, let me just point out here that we are definitely talking about the objective standard here is what is inhibiting the reaction between aniline and nitrobenzene. That's from the specification itself. So I'm surprised that Seiner came to saying, who would ever think of looking at nitrobenzene, that reaction as figuring out what the controlled amount is. Because that's what the specification teaches. The specification also teaches that at line 61, it says, in addition, the amount of product material tolerated will vary with type of base, amount of base, the base cation used in the various solvent systems. And because it notes that there are new variations. I'm still looking for an understanding of why that sentence with the quotes around controlled amount isn't a definition. You say it's not a definition? I'm saying the first part of the definition. No, our first part of the sentence is a definition. So you want part of the sentence to be a definition, but another part of it isn't. I'm saying that ordinary skilled in the art looking at that would see the first part as being definitional, giving you the guidance. And in the second part. How do I know that someone skilled in the art would think that? That was evidence that was presented. That was the finding of the ALJ, for example, at JA 147. Why would someone skilled in the art throw away part of the definition? I don't understand that. Because you need to look at, let's look for the decision advisor, Your Honor. Why would someone skilled in the art throw away part of the definition? Because if it's not part of the definition, one would realize that because if you make it part of the definition, it conflicts with the rest of the specification. It conflicts with example 10. It conflicts with the statements here at the bottom of column four that says that these are subject to variation. And it also conflicts with the statement over in column five, lines 23, where it says the reaction can be conducted under aerobic or anaerobic conditions. And if it's done under aerobic conditions, it's like what's talked about before. But under anaerobic conditions, it can differ. And example 10 is done under anaerobic conditions. The summary of the invention states that the purpose of this invention is to achieve high yields. And example 10 gives the single best example of the single best yields. It also shows that there is a 100% conversion of nitrobenzene with aniline. And a 97% yield for example 10, when you have approximately 10% perfect material, there is no dispute. All the experts agree that one of ordinary still in the art looking at example 10 would realize that this has 10% perfect material. It defies belief that one of ordinary still in the art would look at example 10, which has 100% conversion rate, and think that that shows the inhibiting of the reaction between aniline and nitrobenzene. It discloses on the face of example 10, it states that it's an example showing the reaction of aniline and nitrobenzene. And in the yield portion, it talks about, and this is on column 12, line 11, nitrobenzene conversion equals 100%. Yields based. But it doesn't talk about the amount of water, right? But one of ordinary still in the art knows that there's 10% water there. That's not disputed. So what does it mean that someone who's still in the art would make a computation from example 10, which would trump the explicit definition earlier in the specification? It's not trumping the explicit definition. It's showing that the explicit definition is limited to the clause that is framed as a definition, and that one would understand that the language, e.g., is not part of the definition. I think this court's decision in Pfizer is particularly constructive here. This court found that the statement saccharides, i.e., sugars, did not act as a definition because when one looked at the entire specification, one realized that defining saccharides as sugars would read out the preferred environment, which is exactly what the construction that Syrachem is urging would do here. And it also creates conflict. How do you compute the amount of water? The amount of water in example 10 is shown. The way in which it's computed is shown in the record, and I can get your honor the record sites. We don't know. I do not have the exact record site right here. What I do have is the record site for showing that it's an agreement that it contains 10% water, and that is at JA 230. Is it a complex computation or something? No, your honor. The unrebutted evidence is that one of ordinary skilled New York would understand this to be 10%. You're not answering my question. It's not complicated. But you don't know what it is. I know that it's 10%, and let's look at it. 230, your honor. They note that the respondents do not dispute that the amount of water in example 10 can be calculated and is about 10%. They simply dispute the significance of the example. But again, your honor, I would say that in FISER, IE, which is much more that the plain meaning of IE is that is as opposed to for example. And the plain meaning of IE is much more definitional than for example. In this court, in FISER, you do not let that rule. You do not apply that one isolated statement, because if you do, it creates conflict with the rest of the specification, and you read out the preferred volume. Here, the way to harmonize the specification is by understanding, particularly given the other explicit statements, that the amounts vary. The amount of product material tolerated will vary based on any number of factors, not just the two that are mentioned in that one example. So I see that I'm out of time, your honor. Are you all right? If there's anything that we need for the record or whatever, we're the last one. Can I just make one point with regard to the obviousness? You talk fast. Yes, your honor. All right. Two points I want to make. Sonderkamp argues that the ALJ's decision, and I remind the court that the ALJ has not one, but two chemical degrees. It's as though it never existed. That's not correct, your honor. In Axel versus USITC, this court talked about the scope. No, I appreciate it. It's just that you need to tell us something about this. Thank you. And Chenery is also not applicable to Newhouse versus Nicholson, which was decided this past August. Thank you, Mr. Davis. Mr. Phillips, you have a couple of minutes. Thank you, Judge Newman. I'm going to try to make three basic points in response to my colleagues. First, it seems to me that it is not viable for Mr. Davis to try to redefine a probing material. The commission says very explicitly, page 226 of the joint appendix, it quotes a controlled amount and then includes up to 4% H2O based on the volume and says the emphasized language in this entire paragraph, this is the only sentence that's emphasized, is an express definition. That's binding. That's the commission's determination. You can't go at war with the commission. And so then the question is, well, how do you ignore the express definition under these circumstances? Well, you could potentially get there if there was something very explicit in the specification that might get you there. But there isn't anything very specific in the specification. And example 10 doesn't remotely do that, because example 10 says nothing about water just like you recognized already. All example 10 does, and the reason why you get a huge conversion of nitrobenzene is because you have an enormous quantity of base. And that's what it's designed to teach. But it says in example 10 that it's supposed to illustrate anaerobic conditions. And that's what it does. But it doesn't say anything about water. And it doesn't lead you to look at it. And indeed, the inventor never tested for water as part of the process of analyzing this. And the reason why the specifics which deal with water here ought to ultimately be all you need to look at is that if you look at the language in the specification that they rely on that comes later, in the rest of that column four on page 265, what it says there is not that the amount of water varies with a variety of different variables. What it says is the amount of protic material varies. But every time it talks about water in this specification, it talks about it in terms of 4%. Now, when it talks about a different protic material, it talks about it as an 8%. The reality is no one skilled in the art would go beyond the express definition. And this court should not adopt a rule that encourages people to go beyond the express definition. Otherwise, it seems to me quite clear you throw out the public notice function of this enterprise. That's a ruling this court ought to reject categorically. If there are no further questions, I respond to all of my colleagues. Thank you, Mr. Phelps, Mr. Hill, Mr. Davis. Please state your name and submission.